Filed 10/15/12 (see lead case, S177046, and companion case, S176886, also filed 10/15/12)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S176213 |
| v. | ) | |
| | ) | Ct.App. 2/5 B209568 |
| OLGA RUTTERSCHMIDT et al., | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. BA306576 |
| _____ | ) | |

This is the third of three cases before us involving the federal Constitution's right to confront adverse witnesses. (U.S. Const., 6th Amend.) The two companion cases are *People v. Lopez* (Oct. 15, 2012, S177046) ___ Cal.4th ___, and *People v. Dungo* (Oct. 15, 2012, S176886) ___ Cal.4th ___.

Here, defendant Helen Golay and codefendant Olga Rutterschmidt[1] were in their mid-70's when they were charged with murdering two men — one in 1999, the other in 2005 — by running over each of them with a car. Issued in each victim's name were life insurance policies listing defendant Golay and codefendant Rutterschmidt as beneficiaries. They collected $589,124.93 on one

---

[1] We granted defendant Golay's petition for review but denied codefendant Rutterschmidt's petition. Defendant Golay has asked us to place her name in the caption of the case, to ensure that if she later files a habeas corpus petition in federal court, "the United States Supreme Court knows she was a party to this proceeding." We deny Golay's request because we generally use the name appearing in the Court of Appeal's decision, which in this matter showed Rutterschmidt in its caption.

1

victim's life insurance policies; with respect to the other victim, Golay received $1,540,767.05, and Rutterschmidt $674,571.89.

As relevant here, the prosecution's theory was that one of the two victims (McDavid) had been drugged before he was killed. To prove this point, the prosecution presented the testimony of a laboratory director who, relying on reports not prepared by him, testified that testing of the victim's blood samples by analysts at his laboratory had determined the presence of drugs that could have caused drowsiness. According to defendant Golay, that testimony violated her Sixth Amendment right to confront and cross-examine the analysts who had tested the blood samples. Because any error was harmless, we uphold the Court of Appeal's decision affirming the judgment of conviction.

## I. FACTS AND PROCEDURAL HISTORY

### A. Murder of Paul Vados

In 1997, Paul Vados, then about 70 years old, moved into an inexpensive apartment on South Fedora Avenue in Los Angeles. The off-site apartment manager testified that Vados appeared to have no job and was generally drunk; his apartment was filthy. Twelve-year-old Norma Ceja, the daughter of the on-site manager, testified that she and her mother would bring food to Vados when he was too drunk to care for himself. According to Ceja, Vados was visited about twice a month by codefendant Rutterschmidt, who said she was Vados's sister. Once, Ceja's mother saw Rutterschmidt and another elderly White woman at Vados's apartment. (At that time, defendant Golay and Rutterschmidt were each about 70 years old.)

Between 1997 and 1999, applications for at least six policies insuring Vados's life were made on his behalf. Some policies listed either defendant Golay or codefendant Rutterschmidt as a beneficiary, while others listed both.

2

Rutterschmidt was listed as Vados's cousin and Golay as his fiancée. In fact, Rutterschmidt and Vados were unrelated, and lacking is evidence of a romantic involvement between Golay and Vados.

On the morning of November 8, 1999, the body of 73-year-old Vados was found lying in an alley near North La Brea Avenue in Los Angeles, about a mile from Rutterschmidt's home. Los Angeles Police Officer Lee Willmon, who came to the scene, found no identification papers on the body. Head and chest injuries suggested that Vados had been run over by a car, but Officer Willmon found no glass fragments or car parts at the scene. Vados had no leg fractures, which, according to forensic pathologist Louis Pena, ordinarily occur when a person who is standing or walking is fatally struck by a car. Based on the nature of the injuries, the grease marks on Vados's clothes, and the body's location (perpendicular to the alley), Officer Willmon concluded that Vados, while lying in the alley, was run over by a slow-moving vehicle.

Nine days later, defendant Golay and codefendant Rutterschmidt reported to the police that Vados had been missing for over a week. Rutterschmidt, who signed the missing person report, described herself as Vados's cousin. Thereafter, Rutterschmidt told the off-site manager of Vados's apartment that she had been "in charge of" Vados and would remove his belongings from the apartment. A month or so after Vados's death, defendant Golay telephoned Officer Willmon for a copy of the police report on Vados's death. She said that she was a "one-time fiancée" of Vados and that Rutterschmidt was Vados's cousin.

Golay and Rutterschmidt collected $589,124.93 on the insurance policies taken out on Vados's life.

3

### B. Murder of Kenneth McDavid

In September 2002, defendant Golay leased, and paid for, an apartment for Kenneth McDavid, who had been homeless and living outside a church in Hollywood. In the spring of 2004, McDavid invited two friends, Patrick Lamay and Amy Matte, to stay in the apartment. McDavid told Lamay that at the request of Golay and codefendant Rutterschmidt, he had signed an insurance policy on his life.

Between November 2002 and March 2003, Golay and Rutterschmidt submitted 17 applications for insurance policies on McDavid's life. Thirteen policies were issued by various insurance companies. As had occurred with murder victim Vados, most of the policy applications described Golay as McDavid's fiancée and Rutterschmidt as his cousin, and some policies listed either Golay or Rutterschmidt as a beneficiary, while others listed both.

In January 2004, codefendant Rutterschmidt, accompanied by another elderly woman, bought a used Mercury Sable station wagon from a car dealer. Rutterschmidt said she was buying the car for a friend named Hilary Adler, whose driver's license Rutterschmidt showed to the dealer. Rutterschmidt asked that the car be registered in Adler's name, with an address on South Croft Avenue in Los Angeles. This, however, was not the address shown on Adler's driver's license. Adler testified that she did not know Rutterschmidt and had never lived on South Croft Avenue. Allen's purse, containing her driver's license, had (before Rutterschmidt's purchase of the car) been stolen from the Spectrum Club in Santa Monica; defendant Golay's daughter Kecia was a member of that club.

On October 30, 2004, codefendant Rutterschmidt came to McDavid's apartment with a hired, armed security guard. She told McDavid to leave, and told the guard to stay in the apartment for a week to prevent anyone from entering. Defendant Golay paid a portion of the guard's fee.

4

At approximately 1:00 a.m. on June 22, 2005, nine months after McDavid's eviction from the apartment, his dead body was found lying in an alley near the corner of Westwood Boulevard and Santa Monica Boulevard in Los Angeles. Los Angeles Police Officer Michael McGann came to the scene, as did Kelli Blanchard, an investigator with the Los Angeles County coroner's office. According to Officer McGann, abrasion marks on McDavid's body indicated that he had been dragged, and investigator Blanchard saw a "possible tire imprint" on the front of McDavid's jeans, but the site had no skid marks, no pieces of glass, and no other parts belonging to a car, which Blanchard would have expected if McDavid had been accidentally struck by a car. Near the body, McGann and Blanchard found an undamaged bicycle and bicycle helmet. As was the case with murder victim Vados, grease was on McDavid's clothing and his legs were not fractured.

Two businesses near the scene had video surveillance cameras. Images from one camera, which took photographs every one to two seconds, showed a car driving through the alley shortly before midnight and stopping close to the spot where McDavid's body was later found; after the car's lights went off for about five minutes, the car backed up, its headlights came on, and it continued down the alley, stopping about 75 feet beyond the place where McDavid's body was discovered. The other camera's video images showed that the car was either a Mercury Sable station wagon or a Ford Taurus.

Around 11:55 on the night of McDavid's death, an emergency road service received a call on a cellphone (registered to defendant Golay's daughter Kecia) from a woman giving her name as Golay. She said she was at the corner of Westwood Boulevard and Santa Monica Boulevard in Los Angeles and needed towing of her car, a 1999 Mercury Sable. The car was towed, at Golay's request, to a location near Golay's home in Santa Monica. At 1:00 a.m., a call was made

5

from Kecia's cellphone to codefendant Rutterschmidt's cellphone. Two minutes later, a call was made from Rutterschmidt's cellphone to Kecia's cellphone.

In August 2005, Rutterschmidt, claiming to be McDavid's cousin, asked the police for a copy of the report on McDavid's death in the alley. Rutterschmidt and Golay then filed claims under the insurance policies on McDavid's life. Golay collected $1,540,767.05, and Rutterschmidt $674,571.89.

In May 2006, the police arrested Golay and Rutterschmidt. Shortly thereafter, the police surreptitiously recorded a conversation between the two in a police interview room. In the conversation, Rutterschmidt blamed Golay for buying too many insurance policies, Golay responded: "[Y]ou better be quiet. You better not know anything."

In Golay's house, police found a pill container bearing a prescription label for Ambien (a sleeping pill), but containing a crushed powder that later was determined to have Vicodin (a pain killer), Venlafaxine (an antidepressant that causes drowsiness), and Temazepam (an anti-anxiety drug that causes drowsiness). Also found were two pill containers with prescription labels for Vicodin (prescribed for Golay), and pill containers with prescription labels for Venlafaxine and Temazepam (prescribed for Golay's daughter, Kecia).

The Mercury Sable station wagon that codefendant Rutterschmidt had bought in 2004 was impounded and sold at a lien sale after it was found abandoned. In May 2006, the Los Angeles Police Department repurchased the car. When criminalist Cheryl Hill examined the car's undercarriage, she found human blood, hair, and tissue samples. The tissue samples matched murder victim McDavid's DNA profile; the probability that a randomly selected person would have the same profile was one in 10 quadrillion.

6

### C. Toxicology Analysis of Murder Victim McDavid's Blood

The prosecution's theory was that defendant Golay had drugged McDavid before killing him. To prove this, the prosecution presented the testimony of Joseph Muto, a toxicologist and a certified blood-alcohol analyst.

Muto said he was the laboratory director of the Los Angeles County Department of the Coroner, and that four laboratory analysts working under Muto's supervision had tested samples of McDavid's blood in July of 2005, two weeks after his death. The tests showed that McDavid's blood contained alcohol, zolpidem (the generic form of sleep aid Ambien) and hydrocodone (the generic form of painkiller Vicodin). (As mentioned earlier on p. 6, after arresting Golay and Rutterschmidt the police found prescription drug containers for Ambien and Vicodin in Golay's house.)

Laboratory director Muto explained that after the testing the four analysts gave the data generated by their equipment to clerical staff, who then prepared a report reflecting the test results. After the report was "peer reviewed," the clerical staff entered the data into a computer, which generated a final report. Muto then reviewed the report to correct clerical errors or inaccuracies, to ensure staff members had used the proper procedures, and to ensure that the information had been peer reviewed. After that review, Muto signed the laboratory report. His signature, Muto said, indicated that he had gone "through every step of the procedure [just described] and found that the analyses were done in the normal course of business and were accurate . . . ."

Additional testing of McDavid's blood occurred in July 2006, a year after his death. That laboratory report too was reviewed by laboratory director Muto. He testified that according to the report, murder victim McDavid's blood showed the additional presence of topiramate, an anticonvulsant with side effects of sedation and dizziness.

7

Golay objected to Muto's testimony, contending that it violated her Sixth Amendment right to confront at trial the laboratory analysts who had tested murder victim McDavid's blood samples. The trial court overruled the objection. (The prosecution did not introduce the laboratory reports into evidence.)

Another prosecution witness, forensic toxicologist Vina Spiehler, testified that the combination of drugs found in murder victim McDavid's body would cause a person who did not regularly use those drugs to fall asleep, and would cause a regular user who had developed a tolerance for them to become drowsy and confused.

### D. Verdict and Appeal

The jury found both Golay and Rutterschmidt guilty of two counts of first degree murder and two counts of conspiracy to commit murder; it also found special circumstances of multiple murder and murder for financial gain. The trial court sentenced both defendants to life imprisonment without possibility of parole. The Court of Appeal affirmed the judgment.

As relevant here, the Court of Appeal rejected Golay's contention that laboratory director Muto's testimony regarding two reports prepared by the laboratory (which stated that laboratory tests showed the presence of drugs and alcohol in murder victim McDavid's blood samples) violated Golay's Sixth Amendment right to confront and cross-examine the analysts who performed the tests described in the reports. Moreover, the Court of Appeal stated, even if there was a confrontation right violation, the error was not prejudicial. We granted Golay's petition for review.

## II. BRIEF SUMMARY OF FOUR HIGH COURT DECISIONS RELEVANT HERE

As mentioned earlier on page 1, this case is a companion to two other cases. All three involve a criminal defendant's federal constitutional right to confront

adverse witnesses.  Pertinent are four recent decisions of the United States Supreme Court, which we have discussed in detail in the other two cases.  A brief summary follows.

The first in the high court's quartet of cases is *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), which held that admission of an out-of-court statement against a defendant does not violate the Sixth Amendment's confrontation clause unless the statement is "testimonial" (*id.* at pp. 53-56). *Crawford* did not define the term "testimonial," but it mentioned several *possible* definitions, by several sources, of statements that are testimonial in nature, including " 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; [and] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . .' [citation]." (*Id.* at pp. 51-52.)  The prosecution's use of a testimonial out-of-court statement against a defendant, *Crawford* said, ordinarily violates the defendant's confrontation right unless the person who made the statement is unavailable as a witness and the defendant has had a previous opportunity for cross-examination.  (*Id.* at p. 59.)

Five years later, the high court decided *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*).  In that case, which involved charges of cocaine distribution and trafficking, the prosecution at trial introduced into evidence "certificates of analysis," which had been prepared by nontestifying laboratory analysts and stated that a substance found in plastic bags in the defendant's car was determined to be cocaine.  The high court held that the laboratory certificates fell "within the 'core class of testimonial statements' " (*id.* at p. 310) and thus, under *Crawford*, *supra*, 541 U.S. 36, their use at trial violated the defendant's right to confront the analysts who prepared them.  As *Melendez-*

9

*Diaz* explained, each of the laboratory certificates by the nontestifying analysts was (1) "a ' "solemn declaration or affirmation made for the purpose of establishing or proving some fact" ' " (*Melendez-Diaz*, *supra*, at p. 310), (2) "functionally identical to live, in-court testimony" (*id*. at pp. 310-311), (3) " 'made under circumstances which would lead an objective witness reasonably to believe that [it] would be available for use at a later trial' " (*id*. at p. 311), and (4) created "to provide 'prima facie evidence of the composition, quality, and the net weight' " (*ibid*.) of the substance found in the plastic bags seized from the defendant's car.

Two years later, in 2011, the high court decided *Bullcoming v. New Mexico* (2011) 564 U.S. ___ [131 S.Ct. 2705], which involved a charge of driving while intoxicated. At trial, the prosecution introduced into evidence a report by laboratory analyst Curtis Caylor. The report included Caylor's "certificate of analyst" (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2710]) stating the correctness of his report's conclusion that a blood sample taken at the defendant's arrest had an illegally high level of alcohol. Caylor did not testify; a colleague did. Although the testifying colleague was familiar with the laboratory's testing procedures, he had neither participated in nor observed the testing by Caylor. The high court held that the admission at trial of nontestifying analyst Caylor's laboratory report violated the defendant's right to confront Caylor as an adverse witness. The court noted that unlike the laboratory certificates in *Melendez-Diaz*, *supra*, 557 U.S. 305, which were statements sworn before a notary public attesting to the truth of the reported test results, Caylor's certificate was not a sworn declaration. Nevertheless, the high court pointed out, "Caylor's certificate [was] 'formalized' in a signed document" (*Bullcoming*, *supra*, 564 U.S. at p. ___ [131 S.Ct. at p. 2717]) — the laboratory report — and the report made reference to New Mexico court rules that "provide for the admission of certificate blood-alcohol

10

analyses" (*ibid.*). These "formalities" (*ibid.*) the high court concluded, were "more than adequate" (*ibid.*) to qualify Caylor's laboratory report as testimonial in nature and therefore inadmissible.

In June of this year, 12 days after we heard oral argument in this matter and while it was pending before us, the high court decided *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221] (*Williams*). At issue in *Williams* was testimony by Illinois State Police forensic biologist Sandra Lambatos that a DNA profile (derived from semen on vaginal swabs taken from a rape victim) produced by a Maryland laboratory matched a DNA profile (derived from a sample of the defendant's blood) produced by the Illinois State Police Laboratory.

The plurality opinion by Justice Alito was signed by the Chief Justice as well as Justices Kennedy and Breyer; in a separate concurring opinion Justice Breyer explained why he joined Justice Alito's opinion "in full" (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2252] (conc. opn. of Breyer, J.)). The plurality concluded, based on two alternative grounds, that Lambatos's expert testimony did not violate the Sixth Amendment's confrontation right. First, the plurality reasoned, Lambatos's testimony regarding the Maryland laboratory's report on the DNA profile was admitted not for its truth but only for the limited purpose of explaining the basis of Lambatos's independent conclusion, based on her expertise, that the defendant's DNA matched the DNA in the semen found on the vaginal swabs. (*Id.* at p. ___ [132 S.Ct. at p. 2228] (plur. opn. of Alito, J.).) Alternatively, the *Williams* plurality reasoned, there was no confrontation right violation because the Maryland laboratory's report was not "for the primary purpose of accusing a targeted individual" (*id.* at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.)). Indeed, the plurality noted, the defendant was not yet a suspect when the report was produced. (*Ibid.*)

11

In a concurring opinion, Justice Thomas in *Williams* agreed with the plurality's conclusion that Lambatos's expert testimony did not offend the Sixth Amendment's confrontation right, but for a completely different reason: The Maryland laboratory report on which Lambatos relied "lack[ed] the solemnity of an affidavit or deposition" and was therefore not "testimonial." (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).) A dissenting opinion by Justice Kagan, and signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, and concluded that Lambatos's testimony violated the defendant's confrontation right.

## III. DISCUSSION

As mentioned earlier, laboratory director Joseph Muto of the Los Angeles County Department of the Coroner testified that analysts in his laboratory had conducted a number of tests on samples of murder victim McDavid's blood. (See pt. I.C., *ante*.) The test results appeared in two laboratory reports by analysts who did not testify at trial: One report was prepared in 2005, shortly after McDavid's death; the other was prepared in 2006, after the arrest of defendant Golay and codefendant Rutterschmidt. Based on these two laboratory reports (not introduced into evidence), laboratory director Muto testified that the analysts had detected the presence of alcohol and three sedating drugs in the victim's blood samples.

The Attorney General argues that the two laboratory reports lack sufficient formality to be considered testimonial by the high court, because "[t]here is nothing in the record . . . indicating that the toxicology reports . . . contained . . . solemn or formal declarations or affirmations of accuracy." Laboratory director Muto's testimony about the test results described in the reports, the Attorney General asserts, gave the jury "nothing more than raw data that was distinctly nontestimonial."

12

Furthermore, the Attorney General argues, even if the two laboratory reports were testimonial, Golay had no right to confront and cross-examine the preparers of the reports, because the defense was able to, and did, cross-examine laboratory director Muto. The Attorney General notes that Muto "supervised the work of each of the forensic analysts who contributed to the . . . reports," and "was familiar not only with the individual analysts and laboratory standards but also with the specific testing itself," as he had "personally conducted original analysis in the same laboratory in other cases." Thus, the Attorney General reasons, Muto "was a constitutionally sufficient witness because he did not need to rely on any testimonial statements" in the reports.

With regard to the 2005 laboratory report, the Attorney General makes two additional arguments (not applicable to the 2006 laboratory report). First, the Attorney General notes that when the 2005 report was prepared, the police did not suspect a murder, and although they considered it likely that McDavid was the victim of a hit and run, they had no suspects for that crime. Relying on the three different "primary purpose" tests articulated by three different high court justices in *Williams*, the Attorney General argues that the 2005 report was not testimonial because it was not produced for the primary purpose of "accusing a targeted individual" (*Williams*, *supra*, 567 U.S. at p. ___ [132 S.Ct. at p. 2243] (plur. opn. of Alito, J.)), of "establish[ing] some fact with the understanding that [it might] be used in a criminal prosecution" (*id.* at p. ___ [132 S.Ct. at p. 2261] (conc. opn. of Thomas, J.)), or of "providing evidence" (*id.* at p. ___ [132 S.Ct. at p. 2273] (dis. opn. of Kagan, J.)). Second, the Attorney General contends that because laboratory director Muto "reviewed and signed" the 2005 laboratory report, he had "firsthand knowledge about the testing process," and therefore his testimony about the report's test results did not entitle defendant to cross-examine the testing analysts.

Defendant Golay contends that under *Williams*, *supra*, 132 S.Ct. 2221, both the 2005 and the 2006 laboratory reports are testimonial in nature. Focusing on

13

the reports' formality, Golay asserts that the reports were "solemnized because they were signed by supervisors" and were "formal accusations," and therefore testimonial. Golay argues that even though Muto reviewed and signed the 2005 report and was the director of the laboratory at which both reports were prepared, he was "not really an expert on the subject for which he was testifying." Golay notes that Muto "admitted he was not a pharmacologist . . . and . . . was 'out of [his] . . . area of expertise.' " Thus, Golay reasons, Muto "essentially operated as a conduit to relate to the jury critical evidence" contained in reports by nontestifying laboratory analysts whom the defense could not cross-examine.

We need not decide, however, whether the trial court erred in allowing laboratory director Muto's testimony, because any error did not prejudice Golay. Violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show "beyond a reasonable doubt" that the error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24; see also *People v. Geier* (2007) 41 Cal.4th 555, 608.) Here, that standard is met, because the evidence of Golay's guilt was overwhelming.

The uncontradicted evidence showed that Golay and codefendant Rutterschmidt, through fraud, took out 13 insurance policies on murder victim McDavid; that before McDavid's death, Rutterschmidt and another elderly woman (presumably Golay), bought a car and, to prevent being linked to the car, registered it in the name of a woman whose driver's license had been stolen; that this was the car later used to run over McDavid; that on the night of McDavid's killing an elderly woman identifying herself as Golay telephoned to have a tow truck take this very car from a location close to the scene of McDavid's killing to a place near Golay's home; and that thereafter Golay collected $1,540,767.05 under the insurance policies she had taken out on McDavid's life.

14

The evidence also showed that six years earlier, Golay and codefendant Rutterschmidt had collected $589,124.93 under various policies insuring the life of then 73-year-old Paul Vados, who, like murder victim McDavid, died from being run over in an alley by a car.

In light of the overwhelming evidence against defendant Golay, exclusion of laboratory director Muto's trial testimony in question would, beyond a reasonable doubt, not have affected the outcome of Golay's trial. We therefore agree with the Court of Appeal's affirmance of the judgment of conviction.[2]

## DISPOSITION

The judgment of the Court of Appeal is affirmed.


                                                    KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

---

[2]    The Attorney General has asked us to take judicial notice of the nontestifying analysts' laboratory reports. Defendant opposes the request. Because, as explained above, any error in permitting laboratory director Muto's testimony about the reports was harmless, the reports have no bearing on the outcome here. We therefore deny the Attorney General's judicial notice request.

15

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rutterschmidt

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 176 Cal.App.4th 1047
**Rehearing Granted**

_____

**Opinion No.** S176213
**Date Filed:** October 15, 2012

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** David S. Wesley

_____

**Counsel:**

David H. Goodwin, under appointment by the Supreme Court, for Defendant and Appellant Olga Rutterschmidt.

Roger Jon Diamond and Janyce Keiko Imata Blair, under appointments by the Supreme Court, for Defendant and Appellant Helen L. Golay.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Donald E. DeNicola, Deputy State Solicitor General, Pamela C. Hamanaka and Lance E. Winters, Assistant Attorneys General, Steven D. Matthews, Joseph P. Lee, Lawrence M. Daniels and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

W. Scott Thorpe; and Albert C. Locher, Assistant District Attorney (Sacramento) for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Dolores A. Carr, District Attorney (San Jose) and John Chase, Deputy District Attorney, for California Association of Crime Laboratory Directors as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Roger Jon Diamond
2115 Main Street
Santa Monica, CA 90405
(310) 399-3259

David E. Madeo
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-4925