Filed 6/2/16  P. v. Solis CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050541, G050735 |
| v. | (Super. Ct. No. 13ZF0171) |
| WESLEY LEONEL SOLIS AND, GERARDO CHAVIRA, JR., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Allison L. Ehlert, under appointment by the Court of Appeal, for Defendant and Appellant Wesley Leonel Solis.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Gerardo Chavira.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melisa Mandel, Donald Ostertag, and Stephanie H. Chow, Deputy Attorneys General, for Plaintiff and Respondent.

The trial court found Wesley Leonel Solis and Gerardo Chavira, Jr., (defendants) guilty of assault by means likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)), and found true a sentencing enhancement allegation that defendants committed the assault for the "benefit of, at the direction of, or in association with," the Mexican Mafia (Pen. Code, § 186.22, subd. (b)(1)). The court sentenced defendants to three years for the assault, plus a consecutive three-year term for the gang enhancement, all to be served concurrently with sentences they were then serving in other cases.

Defendants challenge the gang enhancement on grounds the court erroneously admitted the victim's hearsay statements, and the admission of these statements violated both state evidentiary laws and their federal Sixth Amendment right to confront adverse witnesses. We disagree and affirm the judgment.

**FACTS**

In 2012, the Santa Ana Police Department participated in a multi-agency investigation into the Mexican Mafia. The investigation targeted Ralph "Rafa" Bernal, a Santa Nita street gang member. The task force believed Bernal was a "tax" collector for the Mexican Mafia. In other words, he extorted money from drug-dealing members of Hispanic street gangs, and he passed the proceeds to the Mexican Mafia.

In February, a confidential informant wearing a wire met with Bernal to pay taxes on his drug sales. The informant had information John Alvarado, an associate of the McClay Street gang, had been buying drugs from Bernal and owed him money. During their conversation, Bernal told the informant "John-John" owed him money.

In May, a group of jail inmates assaulted Alvarado, and he was moved into protective custody. Alvarado told Orange County Sheriff's Deputy Brian Murray, a jail classification deputy investigating the assault, he had been targeted because he owed drug money to some "Southsiders." Murray asked Alvarado what he planned to do about the situation. Alvarado said he was going to contact a few gang members, including Bernal, in an effort to clear the debt, but he needed to be in protective custody in the meantime.

2

In September, Alvarado told Murray he had resolved his outstanding drug debt and was no longer a target for retribution. Murray moved Alvarado back into the general population. A few hours later, Solis, a member of the Citron Street Anaheim gang, and Chavira and Jose Delapena, members of the West Side Anaheim gang, attacked and injured Alvarado in one of the jail's common areas, or dayrooms.

Investigators later learned Chavira had called an unidentified person shortly before the attack. He asked the unidentified person to call his mother and tell her he was "going to be leaving right now," that he was "probably going to be going to the hole because" of something he had to do "as soon as my dayroom is over."

Two days after the September attack, Alvarado called an unidentified person and asked them to "get a pen and paper." He asked if he or she was "somewhere you can talk?" Alvarado said, "I need you to get ahold [*sic*] of Shy. Tell her to get ahold [*sic*] of who she needs to get a hold of. You know who I am talking about?" He continued, "Tell her I got off of total sep, okay? And I got fucking rushed because of already been fuckin' cleared. She needs to call him back . . . ." After making derogatory comments about law enforcement, Alvarado repeated, "I have already been cleared, but they haven't been notified or something. Communication needs to fix ASAP. I need you to get a pen and a paper. I got off total sep and went into [general population], and I got fuckin' rushed again."

1. *Gang Expert Testimony*

a. *Enriquez*

Rene Enriquez, a former "made" member of the Mexican Mafia testified as a prosecution expert. He was in the organization for 17 years, but left in 2002 to start working as an incarcerated "confidential human source" for the ATF and FBI. Enriquez analyzed intercepted communications from a variety of sources involving the Mexican Mafia and Hispanic street gangs. In exchange, Enriquez received government payments that were gifted to a third party.

Enriquez said the Mexican Mafia is comprised of one percent made members and 99 percent associates from Southern California Hispanic street gangs. Made members of the Mexican Mafia have the ability to control and tax all gang-related criminal activity within their jurisdictions. The Mexican Mafia allows local street gangs to sell drugs in exchange for a certain percentage of the proceeds. This enables the organization to generate millions of dollars in revenue.

According to Enriquez, in Southern California, incarcerated Hispanic street gang members are forced by the Mexican Mafia to abandon their street gang rivalries and give sole allegiance to the Mexican Mafia, also known as Surenos. Surenos are not permitted to fight with one another, or otherwise retaliate against one another, for any personal grudges or grievances they may harbor, and disobedience is punished by an extortion demand, or an act of violence.

Furthermore, the Mexican Mafia keeps track of gang members in custody for the purpose of designating individuals for assault or death if they fail to pay their debts to the organization. Based on a hypothetical mirroring the facts of this case, Enriquez opined defendants' "three-on-one fight" on Alvarado must have been specifically authorized and organized by the Mexican Mafia hierarchy.

*b. Tunstall*

Deputy Seth Tunstall, a member of a state and federal Santa Ana gang task force, said he had been investigating the Mexican Mafia for about 10 years. He identified some of their signs and symbols, such as the black hand, the number 13, and "LA M.A." He testified that at the time of the September assault on Alvarado, the Mexican Mafia had about 150 members in state and federal prisons, and about 2,200 associates throughout the state prison system. The primary activities of the Mexican Mafia are murder, conspiracy to commit murder, attempted murder, assault with a deadly weapon, extortion, and drug sales.

4

Tunstall discussed two predicate crimes committed by active members of the Mexican Mafia. Tunstall also testified about undercover operations involving the Mexican Mafia and Bernal. Alvarado's name had come up during those investigations. In Tunstall's opinion, Alvarado was the "John-John" mentioned during the informant's conversation with Bernal, and Bernal ordered defendants to assault Alvarado.

Tunstall admitted only a small percentage of jail assaults involve the Mexican Mafia. Moreover, he had never seen Alvarado's name on any Mexican Mafia retribution lists, or confiscated inmate communications, nor had he investigated Solis in connection with any prior gang activity.

## 2. Closing Argument

The prosecution argued defendants committed the assault for the benefit of, at the direction of, and in association with, the Mexican Mafia. Defendants asserted the more reasonable inference was "that there was some personal issue between one or all three of the defendants and the victim in this case, that there was some pre-existing debt that was owed one of them that caused a fight," or that Alvarado initiated the fight.

## DISCUSSION

## 1. Confrontation Clause

### a. Arguments at Trial

When the prosecutor asked Murray about Alvarado's statements, defense counsel objected on hearsay grounds. The court sustained the objection and struck the testimony. The prosecutor interjected, "At this time, your honor, I am not offering it for the truth, only the effect it will ultimately have on my expert's opinion of whether this crime was committed at the direction of the Mexican Mafia." The prosecutor explained his gang expert had read a report Murray prepared from notes he took contemporaneously with the incidents, and the expert intended to rely on this information in forming his opinion about whether defendants committed the September assault with the intent to benefit, promote, or further the Mexican Mafia.

5

The court then overruled defense counsel's hearsay objection, and stated, "It will come in not for the truth." At that point Defense counsel objected, "[It] denies my client confrontation of Alvarado." The court stated, "It is not a *Crawford* issue. How is this different? How would it be any different if he wrote a report and this expert relied on it?" Defense counsel asserted *People v. Archuleta*, review granted June 11, 2014, S218640 (*Archuleta*), supported his position. The court again overruled the objection, citing *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*), and *People v. Sanchez* (2014) 223 Cal.App.4th 1, review granted May 14, 2014, S216681 (*Sanchez*).

*b. Arguments on Appeal*

Defendants argue Alvarado's out-of-court statements were hearsay (Evid. Code, § 1220), and the admission of this hearsay, through Murray's testimony, violated their Sixth Amendment right to confront adverse witnesses. (*Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*).) We do not agree, for reasons we will explain.

"We review the trial court's determination as to the admissibility of evidence (including the application of the exceptions to the hearsay rule) for abuse of discretion [citations], and the legal question whether admission of the evidence was constitutional de novo [citation]." (*People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

Defendant's hearsay argument proceeds from a false premise. They assert the court admitted Alvarado's statements for the truth of the matter stated, i.e., to prove Alvarado's drug debt precipitated a sanctioned Mexican Mafia assault. But the record is clear. The court stated, "It will come in not for the truth." Consequently, the statements were not hearsay. (Evid. Code, § 1200; *People v. Ireland* (1969) 70 Cal.2d 522, 529.)

Defendants next question the legal theory that permits out-of-court statements to be admitted not for their truth, but merely as "basis" evidence for an expert's opinion. The court in *People v. Hill* (2011) 191 Cal.App.4th 1104, 1128-1131, posed the same question, and the California Supreme Court has since granted review on the issue in *Archuleta* and *Sanchez*.

6

In the meantime, *Gardeley* is still good law. It holds the expert may rely on otherwise inadmissible hearsay, such as conversations with gang members and information gained from law enforcement, that is "of a type that reasonably [may be] relied upon by experts in . . . forming their opinion." (*Gardeley*, *supra*, 14 Cal.4th at p. 618.) That is because, "a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*Id.* at p. 619.) Of course, we are bound by *Gardeley*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

As for defendants' confrontation clause argument, in *Davis v. Washington* (2006) 547 U.S. 813, 823-825 (*Davis*), the court clarified that the confrontation clause is concerned *solely* with hearsay statements that are testimonial in nature and admitted at trial for the purpose of proving some fact. (*People v. Cage* (2007) 40 Cal.4th 965, 981.) "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the confrontation clause." (*Davis*, at p. 826.)

Further, not every instance of police questioning produces testimonial statements. (*Davis*, *supra*, 547 U.S. at p. 822.) In *Crawford*, the court held police interrogation produces testimonial statements, because it is roughly equivalent to "examinations by justices of the peace in England," who acted as investigators and prosecutors. (*Crawford*, *supra*, 541 U.S. at p. 65.)

But here, Alvarado voluntarily talked to Murray in Murray's capacity as a classification officer, because Murray had to facilitate Alvarado's request to be moved into protective custody. Although Murray took notes each time he talked to Alvarado, he did not prepare a formal report until this case. There is simply no evidence Alvarado's statements led to separate criminal proceedings, or were gathered with future criminal proceedings in mind. Thus, even if Alvarado's statements were hearsay, their admission did not violate the confrontation clause. (*Davis*, *supra*, 547 U.S. at pp. 827-828.)

7

*2. Harmless Error*

Finally, the Attorney General asserts any error in the admission of Alvarado's statement was harmless beyond a reasonable doubt. (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 651.) We agree.

While defendants characterize Alvarado's statements as the "linchpin" of the prosecution's case, they ignore the obvious. We presume the court followed its own evidentiary ruling and properly limited its consideration of Alvarado's statements to the basis for expert opinion.

Furthermore, Enriquez's testimony established the structure of the Mexican Mafia in the Orange County jail in 2012. He said Southern California Hispanic street gang members, 99 percent of the Mexican Mafia, do the bidding of the other one percent. In jail, the Mexican Mafia requires Southern California Hispanic gang members to abandon their street alliances and rivalries and give allegiance to the Mexican Mafia.

From this one can infer Alvarado and defendants, as Southern California Hispanic gang members, were under Mexican Mafia control. This should have prevented defendants from fighting Alvarado, or otherwise retaliating against him, for any personal grudges or grievances. The fact it did not made Enriquez opine, "a three-on-one fight," reflects organization, which most likely "was ordered by a part of the [Mexican Mafia] hierarchy." This opinion is also supported by Bernal's conversation with the informant, Chavira's call before the assault, and Alvarado's call after.

While defendants argue the assault was personal, and that is one reasonable inference, the court was free to infer otherwise. In our view, overwhelming evidence demonstrates defendants came together as gang members to attack a jail inmate on orders from Bernal, without any reference to Alvarado's statements to Murray. In light of the overwhelming evidence of defendants' culpability and gang involvement, we conclude any error in admitting Murray's testimony was harmless beyond a reasonable doubt. (*Rutterschmidt*, *supra*, 55 Cal.4th at p. 651.)

## DISPOSITION

The judgment is affirmed.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.


9