Filed 3/26/25  P. v. Muniz CA4/1

### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMANTHA C. MUNIZ,<br><br>    Defendant and Appellant. | D083374<br><br><br><br>(Super. Ct. No. SCD295246) |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Christine Y. Friedman, and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Samantha C. Muniz of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1); count 1); exhibiting a deadly weapon other than a firearm (§ 417, subd. (a)(1); count 2); and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 3). The jury also found three enhancements to count 1 to be true: (1) in the commission of the assault, Muniz personally inflicted great bodily injury (§ 12022.7, subd. (a)); (2) Muniz committed a serious felony (§ 1192.7, subd. (c)(8)); and (3) Muniz used a vehicle as the deadly weapon to commit the assault (Veh. Code, § 13351.5).

In a bifurcated proceeding, the court found true two aggravating factors. In its oral pronouncement of judgment, the court initially sentenced Muniz to a total term of eight years four months, which was based on a sentence of the upper term of four years on count 1, with a three-year consecutive term for the great bodily injury allegation (§ 12022.7, subd. (a)), plus one year for count 3 and four months ("one-third of the middle term") for count 2, a misdemeanor. Following the hearing, however, the court recognized that the sentence it pronounced on count 2 did not align with its intended ruling and directed the clerk to modify the minute order to reflect a sentence of 60 days in local custody instead. Accordingly, the minute order and abstract of judgment reflect imposition of a 60-day term in local custody for count 2, followed by an eight-year prison term for the other counts.

On appeal, Muniz argues substantial evidence does not support the jury's finding that she personally inflicted great bodily injury in the commission of an assault. Additionally, she asserts that the trial court erred in pronouncing sentence on count 2 and that the sentence must be vacated

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

2

and remanded.  We conclude substantial evidence supports the jury's finding and disagree that the sentence must be vacated and remanded.

FACTUAL BACKGROUND

I.

Prosecution Evidence

Muniz lived directly above J.S. in an apartment building.  The units were near the building's fenced parking lot.

A.  *February 2022 Incident*

In early February 2022, police responded to a report of a disturbance between Muniz and J.S.  J.S. told an officer that Muniz threw a chair over her second-story balcony at J.S.  She had bruises on her right forearm. J.S. also informed the officer that Muniz had a knife and had threatened to cut her.  She explained that, because she did not want Muniz to leave the confrontation, she got in front of Muniz's vehicle.

J.S. provided the police with camera footage showing not only the chair throwing incident but also occasions when Muniz displayed her middle finger to the camera while walking by and sprayed water toward J.S.'s window.  An officer who reviewed the video from February 2022 described J.S. as "hysterical" and challenging Muniz by saying things like, "I dare you," "Come down here," and "Let's fight."

B.  *June 2022 Incident*

Surveillance footage from the apartment complex captured an altercation between Muniz and J.S.  An officer who reviewed the video explained that Muniz came down the stairs from her apartment and appeared to argue with J.S., who remained in her apartment.  At another point in the video, Muniz is seen walking past J.S., putting her bag down, and then coming back toward J.S. waving a knife.

3

J.S.'s friend, D.B., heard J.S. yell, "Call the police" and then "Call 911. Call 911." J.S. walked into the parking lot, followed by Muniz. Muniz got into her car, and J.S. yelled, "You're not going anywhere." J.S. then stood in front of Muniz's car and appeared to be taking photographs with her cell phone. Muniz's windows were up, but D.B. heard her yell, "Get out of my way."

A video recording from Muniz's apartment that she provided to the police shows the interactions that followed.[2] J.S. walked out to the gap in the parking lot fence that led to the street and stood in the center facing Muniz's car and holding up her phone. D.B. was sitting in her truck, which was parked parallel to the street, facing the scene. Muniz pulled forward and paused, inches from J.S., and then drove forward at low speed, bumping J.S. backward. J.S. leaned over and struck the hood of the car twice with her right fist as Muniz continued to drive forward, pushing J.S. with her car.

Muniz stopped the car when J.S. appeared to be in the parking lane of the street, and J.S. again pounded her fist on the hood. Muniz accelerated while turning to the right, and J.S. stumbled or stepped several feet back from the car into the roadway. A black pickup truck passed going from left to right. J.S. then ran back toward the car and banged on the hood from the passenger side of the vehicle. Muniz accelerated, making a wide right turn out into the roadway while J.S. was to the right of, but still touching, the side of the car. J.S. moved alongside the car for several steps and then spun clockwise, doing a full 360-degree turn. She extended her left arm forward once she was facing the same direction the car was headed. The video is grainy, and it is unclear whether she managed to grasp the side mirror. She then continued to turn and fell backward into the roadway out of frame of the

_____

[2]    We grant Muniz's request for late filing of this exhibit.

camera. D.B. called 911 as soon as she realized J.S. was on the ground and walked out to where she was lying.

The driver of the black pickup truck testified that he saw the incident through his passenger window as he drove by. He said Muniz's car was pulling out of the apartment complex as J.S. stood with her hands on the hood. He continued to watch in his rearview mirror. He reported that J.S. went from the front of the car to the passenger side and then the car "took off and kind of whipped [J.S.] into the street." When asked to elaborate as to what he saw, he explained that when J.S. went from the front of the car to the passenger side window, the car "took off towards the right, and it kind of hit her with the side of the car, like—like, the driver door[3] kind of hit the girl and threw her right in the middle of the street."

According to the witness in the pickup truck, Muniz then left the scene and pulled up behind him. He thought the driver was trying to flee, so he blocked her with his truck. He walked back to her car and said, "What are you doing? You know, you just hit somebody and left her in the middle of the street." When he told her he was going to call the police, took a photograph of her license plate, and said that she needed to "go back there," Muniz responded, "This happens all the time." Muniz then made a U-turn and pulled over across the street from where J.S. was lying but did not get out of the car.

A police officer happened to drive by. He noticed J.S. lying on the ground and observed that she was breathing but unconscious. He held her head in place until an ambulance arrived. J.S. never regained consciousness

---

[3]     The truck driver later corrected himself, confirming that J.S. hit the passenger side of the vehicle.

and passed away upon arriving at the hospital.  Her most significant injury was to the back of her head.

Officers subsequently retrieved Muniz's text messages dating back to December 2021.[4]  They were unable to download relevant information from J.S.'s cell phone.  Several of Muniz's messages evidenced ongoing animosity between herself and J.S.

## II.

### Defense Evidence

Muniz testified at trial, and the defense also called a resident manager from the apartment complex, J.S.'s ex-husband and ex-boyfriend, and a medical expert.

A.    *Muniz's testimony*

Muniz explained that she initially was friends with J.S. and babysat her son often.  J.S. had told Muniz about her ex-husband and ex-boyfriends, and Muniz had witnessed an incident between J.S. and the property manager (described below).  She said her relationship with J.S. changed when J.S. accused her of stealing a carpet cleaning machine.  After that, she felt uneasy in the building and started carrying two knives on the outside of her pockets as a "visual deterrent" to keep J.S. from approaching and starting a confrontation.

Regarding the February incident, Muniz said her hands were full, so she set a soda can on her railing while she opened her front door.  It tipped off the edge when she went to grab it.  J.S. came out of her apartment and

---

[4]    Notably, there were no text messages from the seven-day period surrounding the assault with the car, which led an investigating officer to conclude they had been deleted.

accused Muniz of throwing it on purpose.  J.S. then changed her clothes and came back out to yell at Muniz and tell her they were going to fight.

Muniz needed to pick up her daughter at the airport.  After waiting about 20 minutes, Muniz threw a chair over the balcony.  She said she did it because she needed J.S. to leave the area so she could get to her car.

When J.S. went into her house, Muniz walked past J.S.'s door and got into her car.  J.S. came out and stood in the fence opening.  Muniz pulled up to leave but J.S., who was on the phone, started pounding the hood of her vehicle.  Muniz put the car in park and got out.  J.S. threw her phone, squared up like she wanted to fight, and started screaming that Muniz was trying to fight her and was trying to stab her with a knife.  Muniz picked up the phone and told the dispatcher she did not have a knife and wanted to stay on the line until police arrived.  She testified that she had no desire to fight J.S., who was younger and in much better shape than her.

On the day of the June incident, Muniz was on her way to a friend's house.  J.S. spotted her as she walked by, and the two exchanged words.  Muniz thought J.S. wanted to fight, so she put her purse down, turned around, and held up one of her knives.  J.S. started yelling for help, so Muniz headed for her vehicle.

J.S. followed, and Muniz could tell J.S. was angry.  J.S. stood blocking the exit, and Muniz yelled for her to move.  Muniz then lifted her foot partially off the brake pedal so the car would move forward.  She wanted to convey to J.S. that she was not going to park and get out this time.  J.S. began pounding on the hood, so Muniz moved forward and then braked to get J.S. off the car.  J.S. jumped back on and began hitting the hood.

Once Muniz had pushed J.S. off the vehicle and to the right, she cut to the left to go around J.S. and then turned right into traffic.  She thought she

7

had gone around J.S. and started to call 911. When the driver of the black truck stopped her and told her J.S. was lying in the street, she turned around and returned to the scene.

Muniz acknowledged that J.S. previously had obtained two temporary restraining orders against her in 2022. She said the context of some of the text messages presented by the prosecution was her effort to "enlist everyone [J.S.] had harassed, lied on, and acted crazy with to prove a pattern of behavior" at an upcoming hearing.

B.    *Testimony from J.S.'s former partners*

J.S. ex-husband described his relationship with J.S. as "rocky." On one occasion, they got into an argument in the car. He decided to leave after letting her out at their apartment, but she broke his windshield with a metal pole. She then blocked his truck by putting her foot under his rear tire so he could not get out of the apartment complex. He sat there until police arrived.

Although the incident with the metal pole was the worst, he said she prevented him from leaving in his vehicle at least 50 times. She would either put her foot under the tire or hang onto his car. He could not remember a time when he was able to leave while she was there and said he "would have had to hit her or something" and that "would have been an escalation of the situation that [he] didn't want to get into."

J.S.'s ex-boyfriend testified that he drove her home once after they had ended their relationship. After they got out of the car, she threw his phone. He tried to grab the phone, get in his car, and leave, but she started throwing things at the car and then tried to get in. He started the car and began to pull out, but after realizing she was hanging on to the passenger side and getting dragged a bit while still walking, he stopped and called the police.

C.     *Manager's testimony*

The resident manager of the apartment complex described an incident where J.S. stole her husband's hose. When she and her husband later tried to leave in their vehicle, J.S. laid down in front of the car and stayed there for almost an hour. They finally gave up, parked, and went to find an officer to make her get up.

D.     *Medical testimony*

A medical expert testified regarding Muniz's ongoing back problems following a failed surgery to stabilize her spine. He opined that she was at increased risk for a more severe injury than an average person if she were to fall or otherwise injure her back.

DISCUSSION

I.

Sufficiency of the Evidence That Muniz Personally Inflicted Great Bodily Injury in the Commission of an Assault

Muniz does not dispute that she assaulted J.S. with a deadly weapon by repeatedly bumping J.S. with her vehicle, but she contends none of those bumps caused J.S. any injury. She asserts that J.S.'s fall occurred because she lost her footing while running alongside an accelerating vehicle on a public road and trying to hold on to the passenger side mirror. Accordingly, she argues the jury's true finding under section 12022.7, subdivision (a) is not supported by substantial evidence. We disagree.

In considering a challenge to the sufficiency of the evidence, "we must 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) We do not substitute

9

our own factual determinations for the factfinder's (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078) as " '[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact' " (*People v. Brown* (2014) 59 Cal.4th 86, 106).

"The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

Section 12022.7, subdivision (a) provides that "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (§ 12022.7, subd. (a).) The California Supreme Court has observed that the meaning of "personally inflict" is unambiguous and refers to acts " 'done in person without the intervention of another; direct from one person to another.' " (*People v. Cole* (1982) 31 Cal.3d 568, 572.) "The verb 'to inflict' means ' "to lay (a blow) on: cause (something damaging or painful) to be endured: impose." ' " (*People v. Ollo* (2021) 11 Cal.5th 682, 688.) "[T]he meaning of the statutory requirement that the defendant *personally inflict*

10

the injury does not differ from its nonlegal meaning." (*People v. Cross* (2008) 45 Cal.4th 58, 68.)

Muniz argues she did not cause J.S.'s injury with her car because, just before J.S. fell, she was running next to the vehicle and trying to hold on to the passenger side mirror. The implication is that it was J.S.'s own decision, and not an assaultive act committed personally by Muniz, that caused J.S. to stumble and sustain a fatal injury. Having reviewed the record in the light most favorable to the judgment, we conclude substantial evidence supports the jury's interpretation and verdict.

The video recording is pixelated, and it is difficult to make out all the details. However, an equally, if not more reasonable view, of what it depicts is Muniz rapidly accelerating as J.S. moves next to the car, causing J.S.'s back to become pressed up against the passenger side mirror. After getting stuck against the mirror, J.S. appears to spin clockwise off the mirror and do a full 360-degree turn, at which point she comes close to and possibly touches the passenger side door. She reaches out her left hand for the mirror. At this point, the car's front tire is still turned toward the right, indicating the car is still moving toward her. Unable to catch the side mirror or her balance, J.S. spins off the car and falls on her back. In other words, the jury could reasonably have interpreted the video as showing the side mirror of the car Muniz was driving hitting J.S. and knocking her to the ground.

This view is bolstered by the testimony from the driver of the black pickup truck. He recalled that the car "took off and kind of whipped [J.S.] into the street." He said Muniz "kind of hit her with the side of the car, like—like, the [passenger] door kind of hit the girl and threw her right in the middle of the street." As the jury was properly instructed, "the direct evidence of one witness who is entitled to full credit is sufficient for proof of

11

any fact." (Evid. Code, § 411; CALCRIM No. 301.) The record does not contain a basis for discrediting the truck driver's testimony. Thus, it provided solid evidence that Muniz personally inflicted injury on J.S. by hitting her with her car, causing her to fall and strike her head on the ground.

Accordingly, we conclude substantial evidence supported the true finding under section 12022.7, subdivision (a).

## II.

### Error in Pronouncing Sentence

Muniz next contends the court erred in sentencing her to "one-third of the middle term" on count 2, because this reflected a subordinate state prison term, which was unauthorized for a misdemeanor. She argues the appropriate remedy is to vacate the sentence and remand the matter to the trial court to pronounce a lawful county jail sentence or a fine, or both. The People respond that, because the court corrected the sentence and because Muniz has already served the corrected sentence in county jail, the issue does not require reversal.

A violation of section 417, subdivision (a)(1) is punishable by up to six months in the county jail or a fine not exceeding $1,000, or by both. (§ 19.) Where probation is denied, the defendant must be sentenced to county jail for at least 30 days. (§ 417, subd. (a)(1).) A sentence to state prison for this offense is improper. (*In re Kubler* (1975) 53 Cal.App.3d 799, 807.) Thus, it was judicial error for the court to sentence Muniz to a prison term. (See *In re Candelario* (1970) 3 Cal.3d 702, 705 [defining judicial error as error made in rendering judgment, as distinct from clerical error made in recording the judgment rendered].)

12

The first issue we must consider is what effect the court's effort to remedy the error had on her claim. The timing of how the court sought to correct its error requires some analysis of the evidence and argument presented. An ex-parte court order dated October 4, 2024,[5] explains that:

> "At Probation Hearing and Sentencing on December 13, 2023, the defendant was sentenced by the Court to serve 1/3 the middle term as to Count 2, PC417(a)(1), 4 months consecutive, to be served in State Prison.

> "Following the hearing, the Court recognized that the sentence initially read did not align with its intended ruling. The Court directed the clerk to modify the minute order to correctly sentence the defendant as intended.

> "The defendant was sentenced to serve 60 days as to Count 2, PC417(a)(1), in the custody of the Sheriff prior to transport to the California Department of Corrections and Rehabilitation."

Although this order is dated 10 months after the sentencing hearing, it is phrased in the past tense, which implies the court directed the clerk to modify the minute order at an earlier date. The record does not contain a minute order reflecting the original prison term, only one with the 60-day sentence, suggesting the clerk altered the minutes the same day as the sentencing hearing. This understanding is buttressed by two facts. First, the felony abstract of judgment, dated the next day, does not list a four-month prison commitment for count 2. Second, in her reply brief, Muniz stated that

---

[5]     The People request that we take judicial notice of the court's ex-parte order, which was filed in the superior court. Because this order helps clarify how and when the court modified both Muniz's sentence and the December 13, 2023 minute order contained in the record, we construe the People's request as a motion to augment the record on appeal, and so construed, grant the request. (Cal. Rules of Court, rules 8.155(a)(1)(A), 8.340(a).)

"at the time of the ex parte resentencing hearing, the trial court had all then-available relevant information . . . having just imposed its harsh sentence *moments earlier . . . .*" (Italics added.) Thus, it appears the sentence was corrected immediately, and Muniz served her jail term before being transported to the custody of the California Department of Corrections and Rehabilitation (CDCR). A record the People provided from the CDCR,[6] which shows that Muniz did not enter state prison custody until February 13, 2024—60 days after her sentencing—is consistent with this conclusion.

Muniz nonetheless contends the original sentence was unauthorized and must be vacated. "[A] sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case." (*People v. Scott* (1994) 9 Cal.4th 331, 354.) An exception to the waiver doctrine, the unauthorized sentence rule allows a court that has some independent basis for asserting jurisdiction over the judgment to correct a sentence on appeal even if the defendant failed to object below. (*In re G.C.* (2020) 8 Cal.5th 1119, 1129–1130.) "The appellate court may intervene in the first instance because these errors 'present[ ] "pure questions of law" [citation], and [are] " 'clear and correctable' independent of any factual issues presented by the record at sentencing" ' and without 'remanding for further findings.' " (*Id.* at p. 1130.)

As the People point out, we need not delve into whether the sentence was unauthorized or the implications of such, because the issue is moot. Under the general common law rule, a trial court retains jurisdiction to

---

6    We grant the People's request to judicially notice the CDCR record attached to their request as exhibit B. (Evid. Code, §§ 452, subd. (h); 459, subd. (a).)

14

resentence a criminal defendant until execution of the sentence has commenced. (*People v. Karaman* (1992) 4 Cal.4th 335, 344.) Because it appears the court resentenced Muniz the same day and before committing her to custody, it had jurisdiction to do so. Muniz does not argue the new 60-day jail term is unauthorized or otherwise infirm. Therefore, there is nothing to correct.

In Muniz's view, the correction did not fully remedy the error because she contends she had a right to be present when the court modified the sentence and was entitled to a full resentencing hearing. We conclude that any such errors were harmless.

Violations of defendant's statutory right to be present during critical stages are subject to harmless error review. (*People v. Mendoza* (2016) 62 Cal.4th 856, 901–902.) " 'Under the federal Constitution, error pertaining to a defendant's presence is evaluated under the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705.' " (*Mendoza,* at p. 902.) In other words, the error "may be deemed harmless only if we can conclude beyond a reasonable doubt that the deprivation did not affect the outcome of the proceeding." (*People v. Simms* (2018) 23 Cal.App.5th 987, 998; see also *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.)

Here, Muniz argues that in the time since her December 2023 sentencing, she has had the opportunity to reflect upon her actions and their impact on the victim, the community, and her daughter, and to avail herself of rehabilitative opportunities. If given the opportunity during a resentencing hearing to demonstrate that her world view has changed, she argues there is a reasonable possibility the trial court would impose the same harsh punishment.

Our prejudice analysis does not hinge upon what the court might do *now*, however. Rather, because the error alleged was that the court modified her sentence on December 13, 2023, outside of her presence, we consider whether we can say beyond a reasonable doubt that the outcome would not have been different had she been there *that day* and been afforded a full resentencing hearing. As Muniz herself acknowledges, given that the court had just imposed its sentence "moments earlier," there is no reason to think it would have exercised its discretion differently. The error was not a factual misunderstanding that might have inspired the court to take a more lenient view, but simply a legal error that required consideration of a different range of sentencing options. And, in fact, the error worked in Muniz's favor. Although the court could have kept the sentence at four months under section 19, albeit in county jail instead of state prison, the court opted to reduce the sentence to 60 days. On these facts, we can confidently conclude beyond a reasonable doubt that Muniz's presence when the court corrected its intended sentence on count 2 after the sentencing hearing would not have affected the outcome.

## DISPOSITION

The judgment is affirmed.

BUCHANAN, Acting P. J.

WE CONCUR:

KELETY, J.

RUBIN, J.

17